**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 22, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEPHEN MARESCA; HEATHER
MARTIN-MARESCA; M.M.; C.M.;
ANTHONY MARESCA,

      Plaintiffs - Appellants,

v.                                                                       No. 14-2163

BERNALILLO COUNTY; BERNALILLO
COUNTY SHERIFF OFFICERS,
DEPUTY, J. FUENTES; DEPUTY, G.
GRUNDHOFFER; DEPUTY, L. TONNA;
DEPUTY, E. LUCERO; DEPUTY, L.
SWINT; DEPUTY, S. QUINTANA,

      Defendants - Appellees.
_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:13-CV-00733-PJK-KBM)**
_____

Joseph P. Kennedy; (Michael L. Timm, Jr., with him on the briefs), Kennedy Kennedy &
Ives, Albuquerque, New Mexico for Plaintiffs-Appellants.

Deborah D. Wells, Kennedy, Moulton & Wells, P.C., Albuquerque, New Mexico, for
Defendants-Appellees.
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **BRISCOE**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

Plaintiffs-Appellants Stephen Maresca, Heather Martin-Maresca, and their three children were driving back from a family hike when they were arrested in a "felony stop" carried out by Bernalillo County Sheriff's Deputies J. Fuentes, G. Grundhoffer, and four other officers.[1] Deputy Fuentes initiated the stop because she mistakenly believed that the Marescas were driving a stolen vehicle. The Marescas sued, alleging that the officers violated the Marescas' Fourth Amendment rights both by unlawfully arresting them and by using excessive force in doing so. On cross-motions for summary judgment, the district court held that the officers were entitled to qualified immunity because they had not violated clearly established Fourth Amendment standards. We have jurisdiction under 28 U.S.C. § 1291 and we AFFIRM IN PART and REVERSE IN PART AND REMAND, holding the following: (1) the Marescas are entitled to summary judgment against Deputy Fuentes on their unlawful arrest claim because they were arrested without probable cause as the result of Deputy Fuentes's unreasonable conduct; (2) Deputy Grundhoffer is entitled to qualified immunity on the unlawful arrest claim against him because he was entitled to rely on information conveyed to him by his fellow officer (Deputy Fuentes) that the Marescas were in a stolen vehicle; and (3) disputed issues of material fact—primarily whether any of the deputies pointed firearms at the Marescas after they had been detained—preclude summary judgment for Fuentes,

---

[1] The four other officers, Deputies L. Tonna, E. Lucero, L. Swint, and S. Quintana, were also defendants and appellees in this case. The Marescas have voluntarily dismissed them from this appeal.

2

Grundhoffer, or the Marescas on the excessive force claim and accordingly on that claim we reverse the district court's grant of summary judgment for Fuentes and Grundhoffer and we affirm the district court's denial of summary judgment for the Marescas and remand.

## I. FACTS

Unless noted otherwise, the parties do not dispute the following facts: The Maresca family—Stephen Maresca, Heather Martin-Maresca, their three children (seventeen-year-old Anthony Maresca, fourteen-year-old C.M., and nine year-old M.M.), and their dog (Maya)—were returning from a family hiking trip on March 14, 2013, when Fuentes saw them driving by in their red 2004 Ford F-150 pickup truck. The Marescas had violated no traffic laws and there was nothing about their truck that caught Fuentes's attention. Mr. Maresca—a former police officer—waved at Deputies Fuentes and Grundhoffer as the Marescas drove by.

Fuentes, who had completed training as a new officer approximately two months earlier, was on routine traffic patrol and decided randomly to follow the Marescas. While doing so, Fuentes used the on-board computer in her vehicle to enter the Marescas' license plate number into the National Crime Information Center ("NCIC") database. Her entry, however, was off by one digit: the Marescas' plate was 52<u>6</u>-PLF, but Fuentes entered 52<u>5</u>-PLF.

As a result of this typing error, Fuentes's NCIC screen returned an entry for a maroon (or red) 2009 four-door Chevrolet sedan with expired plates, which was

3

listed as stolen.[2]  Fuentes failed to notice the considerable mismatch between the description of the stolen car in the NCIC report (a maroon 2009 Chevrolet sedan with expired plates) and the Marescas' truck (a red 2004 Ford pickup truck with current plates).  These differences are <u>not</u> minor; they are material and obvious.  The car in the NCIC report did not match the Marescas' truck in (1) color, (2) type of vehicle, (3) make, (4) model, (5) year, (6) license plate number, or (7) license plate registration status.

The NCIC screen also stated: "Warning—the following stolen vehicle record contains expired license plate data. Use caution, contact entering agency to confirm status."  Aplt. App. at 239.  Bernalillo County officers are, in any event, trained to double-check stolen vehicle reports and are told it is a good practice to have dispatch verify the information in those reports before approaching a potentially stolen vehicle.

Notwithstanding the NCIC warning and the officers' training, Fuentes and Grundhoffer (who was patrolling with Fuentes and traveling behind her in a separate car) did not take any steps to confirm that the Marescas' vehicle was in fact stolen before stopping the Marescas.  This is so even though nothing in the record suggests that there were exigent circumstances that necessitated Fuentes stopping the Marescas immediately, before taking time to verify that the vehicle they were in was stolen.

_____

[2] The NCIC return screen, in different places, identified the stolen vehicle as red and as maroon.

4

At 5:06 p.m., Fuentes pulled the Marescas over with her overhead lights flashing. As she did so, Fuentes called the Marescas' actual plate number, 526-PLF, into dispatch, stating that the vehicle was stolen. Without waiting for dispatch to verify the information, Fuentes stated over the radio that she was going to conduct a "felony stop." This announcement caused other deputies to respond to assist Fuentes with the stop. Before the other deputies arrived, Fuentes, aided initially only by Grundhoffer, implemented "felony stop" procedures. The two deputies parked their vehicles behind the Marescas' stopped truck, stood behind the open doors of their vehicles, drew their weapons, and aimed them at the Marescas' vehicle. Fuentes began shouting commands to the Maresca family: she first ordered all of them to put their hands up in the air where she could see them. Then she ordered Mr. Maresca to turn off his truck, throw his keys out the window, and exit the truck with his hands in the air. Next, Fuentes ordered Mr. Maresca to lift his shirt by the collar and turn around so she could check his waistband for weapons. She then ordered him to walk backwards toward the officers and get on his knees, then lie on the highway on his stomach with his arms out and his legs up in the air. Fuentes then repeated this procedure with Mrs. Maresca. The Marescas complied with every command.

As they were lying prone on the ground, Mr. and Mrs. Maresca told Fuentes and Grundhoffer that there were children and a dog in the truck. Mr. Maresca further told the officers that there had to be a mistake, and implored them to check his license and check "everything" because his family was in the truck. Id. at 154. Mrs. Maresca likewise asked the deputies to check the truck's license and registration.

5

The officers ignored the Marescas and did not ask whether they owned the vehicle. In his deposition, Grundhoffer, who was aiding Fuentes, admitted that he thought the situation was "a little weird." Id. at 131.

Fuentes continued to aim her handgun at the Marescas' truck even after Mr. and Mrs. Maresca were on the ground and after they told the deputies that there were children in the truck. The deputies ordered the two boys, C.M. and Anthony, one by one from the truck using the same "felony stop" procedure—keeping their hands in the air, lifting their shirts to expose their waistlines, walking backwards toward the officers, and lying prone on the ground. As the officers ordered the children out one by one, Mr. Maresca told the deputies that "[t]his does not warrant a felony stop." Id. at 324. Finally, Grundhoffer ordered nine-year-old M.M. to exit the truck and lift her shirt. The evidence is disputed as to whether the deputies ordered M.M. to lie on the ground with her hands behind her back or, instead, let her stand to the side, telling her "stern[ly]" not to move, id.

After all of the Marescas were out of the truck, Maya (the dog) became upset, jumped out of the truck, and ran into the highway. Mrs. Maresca feared that Maya would be run over. Mr. Maresca called Maya to him and the deputies permitted Mr. Maresca to hold onto the dog.

While Fuentes and Grundhoffer were getting the Marescas out of their truck and onto the ground, additional deputies—Defendants Tonna and Lucero—arrived. Because the "felony stop" was blocking much of the two-lane highway where it

6

occurred, Lucero began trying to direct traffic around the scene. The officers eventually had to stop highway traffic in both directions.

After all of the Marescas were out of the truck and lying on the highway (except perhaps M.M.), Defendants Deputy Swint and Deputy Quintana arrived. Although disputed, the Marescas presented evidence that Swint stood directly over fourteen-year-old C.M., as he was lying prone on the ground as ordered, and pointed a gun at C.M., leading C.M. to cry and "freak[] out" for fear of being shot, saying "Mom, they're going to shoot us, they're going to shoot me," id. at 323.

There was also evidence, which Defendants disputed, that Quintana stood over Mrs. Maresca, as she was lying on the highway, and pointed his gun at her head with his finger on the trigger in what Mr. Maresca characterized as a "gangster thing where he turns [the gun] on the side." Id. at 327. Mrs. Maresca, fearing that she would be inadvertently shot, began to "panic," screaming and crying. Id. As the stop continued, the children were crying and Mrs. Maresca tried to talk with them to calm them down. Eventually, deputies handcuffed each member of the Maresca family (except M.M.) and locked them in separate squad cars (except that M.M. was locked in a car with her mother).

Fuentes and Grundhoffer then checked the Marescas' vehicle to insure that there was no one still in the truck. In doing so, the deputies approached the Marescas' truck from opposite sides, with their guns drawn, warning each other to "[w]atch out for cross-fire." Id. at 324.

7

Finally, between seven and fifteen minutes into the stop, Fuentes returned to her car and re-ran the Marescas' license plate. She then realized that the Marescas' truck did not match the stolen vehicle information on her computer screen. Fuentes asked Tonna whether she was going to get in trouble, and he told her to get the family out of the patrol cars, uncuff them, and call a sergeant. Sergeant John Bartholf was called to the scene. He explained to Mr. and Mrs. Maresca that Fuentes was a new officer. The parties dispute whether Bartholf, or any other officer on the scene, apologized to the Marescas. Mrs. Maresca asked Quintana, in front of Sgt. Bartholf: "Why did you think it was necessary to point your gun at me when I'm already laying on the ground?" Id. at 327. According to Mrs. Maresca, Quintana just smiled and walked away.

After the incident, the Marescas filed complaints with the sheriff's department. Fuentes was "counseled" that she needed to make sure that she "checks, double-checks and sometimes triple-checks the information that's in front of her," id. at 189; that it is a good practice to have dispatch verify the vehicle as stolen "especially if she is busy doing something else that may diminish her attention-to-detail," id. at 380; and that it is important to double check information on vehicle queries and to match indicators such as vehicle descriptions while doing so.

The Marescas filed suit under 42 U.S.C. § 1983 in New Mexico state court, alleging that Deputies Fuentes, Grundhoffer, Tonna, Lucero, Swint, and Quintana had violated the Marescas' Fourth Amendment rights to be free from unlawful arrest

8

and excessive force.[3]  The Marescas also asserted state-law claims against the officers for assault, false imprisonment, battery, and negligence, and against Bernalillo County for negligent training.  Defendants removed the case to the U.S. District Court for the District of New Mexico.  The Marescas filed a motion for summary judgment on their federal law claims, and the deputies filed a motion for summary judgment on all claims.  The district court denied the Marescas' motion for summary judgment, granted summary judgment to Defendants as to all federal claims, and dismissed the Marescas' state claims without prejudice.[4]

## II. ANALYSIS

We consider the parties' cross-motions for summary judgment separately, see Constitution Party v. Kobach, 695 F.3d 1140, 1144 (10th Cir. 2012), reviewing the district court's orders granting and denying summary judgment *de novo*, see Koch v. City of Del City, 660 F.3d 1228, 1237 (10th Cir. 2011).

> Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to

---

[3] The Marescas' complaint actually frames their Fourth Amendment allegations as four claims, alleging that the officers violated the Marescas' Fourth Amendment right to be free from (1) unreasonable seizure, (2) excessive force, (3) unlawful detention, and (4) unlawful arrest.  We discern only two separate Fourth Amendment claims in their arguments, however: (1) arrest without probable cause (or, in the alternative, detention without reasonable suspicion) and (2) excessive force.

[4] The Marescas do not challenge on appeal the dismissal of their state-law claims and, having voluntarily dismissed Deputies Tonna, Lucero, Swint, and Quintana, the Marescas no longer challenge summary judgment entered in favor of those deputies. The only claims that remain for our consideration, then, are the Marescas' claims that Deputies Fuentes and Grundhoffer violated the Marescas' Fourth Amendment rights by 1) unlawfully arresting them and 2) using excessive force in doing so.

9

judgment as a matter of law. In making that determination, a court must view the evidence in the light most favorable to the opposing party.

Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (citations and internal quotation marks omitted).

In defending against § 1983 claims like the ones at issue here, an official may plead an affirmative defense of qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982). This defense is based on the presumption that officials know and respect "basic, unquestioned constitutional rights" as measured by clearly established law. Id. (internal quotation marks omitted). Qualified immunity is unavailable "if an official *knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff . . . ." Id. (internal quotation marks and alteration omitted).

Therefore, "[i]n resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan, 134 S. Ct. at 1865. "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." Id. at 1865–66 (citations, internal quotation marks and alterations omitted).

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation." Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). Ordinarily, this means that "there must be a

10

Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Id. at 1114–15. However, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. (internal quotation marks omitted).

> A plaintiff . . . need not cite a factually identical case to demonstrate the law was clearly established. . . . A plaintiff may therefore carry the burden of demonstrating a right is clearly established by citing cases that have a sufficient degree of factual correspondence to enable a reasonable officer to know that the officer's acts violated the plaintiff's constitutional or statutory rights.

Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1257 n.9 (10th Cir. 1998) (citations omitted).

In this case, the Marescas argue that Deputies Fuentes and Grundhoffer violated the Marescas' Fourth Amendment rights by (1) arresting them without probable cause and (2) using excessive force in the course of that arrest.

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez, 478 F.3d at 1127 (footnote omitted).

11

A.  The Marescas' unlawful arrest claim

The Marescas first contend that Deputies Fuentes and Grundhoffer violated the Fourth Amendment by arresting the Marescas without probable cause.

*1. The stop was an arrest*

The Fourth Amendment protects against unreasonable seizures.  The parties do not dispute that the deputies seized the Marescas.  See United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998) ("It is undisputed that 'stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment.'" (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979) (alterations omitted)).  But the parties disagree as to whether that seizure was an arrest or an investigative detention (also known as a Terry stop[5]).

An arrest must be based on "probable cause to believe that a person committed a crime," and "is distinguished" from an investigative detention "by the involuntary, highly intrusive nature of the encounter."  Cortez, 478 F.3d at 1115 (internal quotation marks omitted).  "The use of firearms, handcuffs, and other forceful techniques" generally suggests an arrest.  Id. at 1115-16; see also Morris v. Noe, 672 F.3d 1185, 1192 (10th Cir. 2012).  An investigative detention, on the other hand, permits an officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause."  Cortez, 478 F.3d at 1115 (internal quotation marks omitted).  Investigative detentions are characterized

[5]  Terry v. Ohio, 392 U.S. 1 (1968).

by their "limited intrusion on the personal security of the suspect." Florida v. Royer, 460 U.S. 491, 500 (1983). There is no bright line or litmus test distinguishing these two types of seizures. See id. at 506; see also United States v. Sharpe, 470 U.S. 675, 685 (1985).

Here, because of the actions the deputies took to effect the stop—ordering the Marescas out of their truck at gunpoint, forcing them to lie face-down on the highway, handcuffing four of them and locking them in separate patrol cars—we conclude the deputies arrested the Marescas. See United States v. Melendez-Garcia, 28 F.3d 1046, 1050, 1052-53 (10th Cir. 1994) (holding "felony stop," during which officers directed occupants of vehicle to exit one at a time, handcuffed and frisked them, and then placed the suspect in separate patrol cars, was an arrest). This stop took between seven and fifteen minutes—a duration which, although not dispositive, suggests that this was more than a "limited intrusion" lasting "no longer than is necessary to effectuate the purpose of the stop," Royer, 460 U.S. at 500. Moreover, in considering the totality of the circumstances, see Melendez-Garcia, 28 F.3d at 1051, we also consider the intrusion on the Marescas' dignity when they were required to lift their clothes and assume prone positions on the ground in view of other motorists and the officers themselves. See Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001) (stating, in addressing injuries necessary to support excessive force claim, that "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they

13

include liberty, property and privacy interests—a person's 'sense of security' and individual dignity.").

The deputies accurately point out "that the use of firearms, handcuffs, and other forceful techniques does not <u>necessarily</u> transform a <u>Terry</u> detention into a full custodial arrest," <u>Melendez-Garcia</u>, 28 F.3d at 1052 (emphasis added). But that is so "when the circumstances reasonably warrant such measures" in order for the officers to conduct an investigative detention safely. <u>Id.</u>; <u>see</u>, <u>e.g.</u> <u>United States v. Shareef</u>, 100 F.3d 1491, 1495-99, 1506 (10th Cir. 1996) (holding display of firearms, removing occupants from three stopped vehicles and frisking and handcuffing them did not transform <u>Terry</u> stop occurring late at night into an arrest because officers "reasonably suspected [one of the motorists] of being armed and dangerous"); <u>United States v. Perdue</u>, 8 F.3d 1455, 1458-59, 1462-63 (10th Cir. 1993) (holding fact that two officers removed two occupants from vehicle at gunpoint and made them lie on the ground did not transform <u>Terry</u> stop occurring in remote area into an arrest where officers reasonably believed occupants were "armed and dangerous"). Here, on the other hand, the deputies had no objectively reasonable basis to believe that such forceful measures were necessary for them to conduct an investigative detention. The deputies stopped the Marescas on a highway in broad daylight and had no indication that the Marescas were "armed and dangerous." Furthermore, the Marescas fully cooperated by pulling over and complying with every directive the officers gave. Under these circumstances, the deputies, by ordering the Marescas out of the car one-by-one at gunpoint, making them lie on the ground, handcuffing four

14

of them and placing them in separate patrol cars, effected an arrest. See Melendez-Garcia, 28 F.3d at 1050, 1053 (holding that felony stop—during which officers removed occupants, whom they suspected of drug trafficking, from vehicles at gunpoint, frisked, handcuffed and placed them in separate patrol cars—was an arrest, where, among other factors, the stop occurred "on an open highway during the day, [officers] had no tips or observations that the suspects were armed or violent, and [the suspects] had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders").

> 2. *Because the Marescas were arrested without probable cause, based on only Fuentes's unreasonable mistake, they are entitled to summary judgment against Fuentes on their unlawful arrest claim.*

We next consider whether Deputy Fuentes had probable cause to arrest the Marescas. This "is a legal issue that we review de novo." United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004). Probable cause exists only if, in the totality of the circumstances, the "facts available to the officers at the moment of the arrest would warrant a [person] of reasonable caution in the belief that an offense has been committed." Beck v. Ohio, 379 U.S. 89, 96 (1964) (internal quotation marks omitted). In the qualified immunity context, we ask "whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause." Cortez, 478 F.3d at 1116.

The arrests at issue here were not supported by probable cause because Fuentes lacked an objectively reasonable basis to believe that the Marescas' truck

15

was stolen.  An unreasonable mistake of fact cannot furnish probable cause.  United States v. Herrera, 444 F.3d 1238, 1246 (10th Cir. 2006).

> [W]hat is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

Illinois v. Rodriguez, 497 U.S. 177, 185 (1990).

Moreover, in determining whether there is probable cause, officers are charged with knowledge of any "readily available exculpatory evidence" that they unreasonably fail to ascertain.  Baptiste, 147 F.3d at 1259 (quoting Clipper v. Takoma Park, 876 F.2d 17, 19-20 (4th Cir. 1989)).  "[T]he probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Cortez, 478 F.3d at 1117 (internal quotation marks omitted).

In this case, such readily available exculpatory evidence included the stolen-vehicle description already on Fuentes's computer screen before the arrest, which did not match the Marescas' truck in style, make, model, year, color, license plate number, or registration status; and the corrective information that dispatch presumably would have provided had Fuentes waited for verification, in accordance with her training.  These steps were not taken.  See Baptiste, 147 F.3d at 1257 ("A police officer may not close her or his eyes to facts that would help clarify the

16

circumstances of an arrest.") (quoting BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)); see also Phelan v. Village of Lyons, 531 F.3d 484, 488 (7th Cir. 2008).  Even after stopping the Marescas, Fuentes could have gleaned readily available exculpatory evidence by interviewing the Marescas, considering the Marescas' specific, repeated requests to recheck their license plate and the fact that all of the Marescas were fully compliant and showed no indicia of any risk to officer safety, and recognizing the commonsense implications of the fact that the truck's passengers were a family of five (plus the family dog) on a state highway during the daytime.

The sole basis for arresting the Marescas was Fuentes's mistaken and unreasonable belief that their truck was stolen.  That belief arose because Fuentes mistyped the Marescas' license plate number into her computer, thereby triggering the stolen vehicle report.  We do not hold that a mere typing error in entering a license plate number would make it unreasonable for the officer to rely on the result of the database inquiry.  In the often unpredictable and fast-paced context of traffic stops, we cannot require perfection—only reasonable behavior.  Our conclusion that it was unreasonable for Fuentes to arrest the Marescas is based upon all the circumstances of the case and, in particular, Fuentes's failure to use readily available information—already on the computer screen in front of her and from the dispatcher—to verify that the Marescas' vehicle was reported stolen before arresting them.  According to Fuentes's supervisor, Sergeant Bartholf, "[Deputies are] supposed to verify the information on the screen, the year of the car, the color, the make, the model and whether or not what's on their screen is the same car that's in

17

front of them," Aplt. App. at 319, and it is a good practice for officers to confirm with dispatch that the stolen vehicle report was accurate and up-to-date. Yet Fuentes did neither. See, e.g., Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training.").[6]

Every application of the Fourth Amendment's reasonableness standard is fact-dependent, and the myriad circumstances officers confront do not lend themselves to bright-line rules. Thus, we do not suggest that an officer must *always* double-check a database hit or await confirmation from dispatch that the hit is accurate. There are undoubtedly circumstances that would justify a reasonably prudent officer's decision to bypass such steps. However, in the circumstances of this case, which did not suggest any likely threat to the arresting officers or any need for immediate action preventing verification, a reasonable officer would be expected to confirm the accuracy of her information in light of the disparity between the vehicle described on the stolen vehicle report and that driven by the Marescas. In fact, Fuentes could have detected her error by merely reading (or rereading) the computer screen right in front of her that reported the database result.

Fuentes, then, is charged with knowledge of the readily available exculpatory information on her screen. That information did not provide an objectively

---

[6] In light of these particular facts presented in this case, United States v. Hines, 564 F.2d 925, 927-28 (10th Cir. 1977), which indicates as a general rule that an NCIC stolen vehicle report is sufficient to establish probable cause, is inapposite.

reasonable basis for seizing the Marescas at all—much less give Fuentes probable cause to arrest them in a felony stop. Therefore, the undisputed facts establish that Fuentes violated the Fourth Amendment when she arrested the Marescas without probable cause. And it was clearly established, at the time of this arrest, that an officer must have probable cause to arrest an individual, and the officer must reasonably investigate readily available exculpatory evidence "before invoking the power of warrantless arrest and detention." Cortez, 478 F.3d at 1117 (internal quotation marks omitted). We therefore conclude that Fuentes is not entitled to qualified immunity on the Marescas' unlawful arrest claim, and, to the contrary, the Marescas are entitled to summary judgment against Deputy Fuentes on that claim.

*3. Grundhoffer is entitled to qualified immunity because he reasonably relied on Fuentes's report that the Marescas' vehicle was stolen*

In assisting Fuentes in arresting the Marescas, Deputy Grundhoffer relied on Fuentes's statement that the Marescas' truck was stolen. "A police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable." Felders ex rel. Smedley v. Malcom, 755 F.3d 870, 882 (10th Cir. 2014) (internal quotation marks omitted), cert. denied, 135 S. Ct. 975 (2015); accord, e.g., Baptiste, 147 F.3d at 1260 ("Police work often requires officers to rely on the observations, statements, and conclusions of their fellow officers. An officer who is called to the scene to conduct a search incident to arrest is not required to reevaluate the arresting officer's probable cause determination in order to protect

19

herself from personal liability."). This rule makes sense, because "[e]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." Oliver v. Woods, 209 F.3d 1179, 1191 (10th Cir. 2000) (quoting United States v. Hensley, 469 U.S. 221, 231 (1985)). "Accordingly, the 'good faith' defense shields objectively reasonable good faith reliance on the statements of a fellow officer, but does not protect deliberate, reckless, or grossly negligent reliance on the flawed conclusions of a fellow officer." Felders, 755 F.3d at 882.

Here, there is no evidence that Grundhoffer's reliance on Fuentes's statement was in bad faith or unreasonable under the circumstances. Grundhoffer was traveling in a separate car immediately behind Fuentes when Fuentes stated over the radio that the Marescas were driving a stolen vehicle. Unlike Fuentes, he did not have a computer screen in front of him describing the stolen vehicle and could not see the Marescas' plate at the time Fuentes first made the stop. Grundhoffer testified that the officers followed the Marescas for only about a quarter of a mile between Fuentes's statement and her pulling the Marescas over, so Grundhoffer had no reasonable opportunity to investigate on his own and double-check the accuracy of Fuentes's conclusion before initiating the arrest. Under these undisputed circumstances, Grundhoffer reasonably and in good faith believed that probable cause to arrest existed at the moment of the stop. He is therefore entitled to qualified immunity on

20

the unlawful arrest claim; accordingly we affirm the grant of summary judgment for Grundhoffer on the unlawful arrest claim.

B. <u>The Marescas' excessive force claim presents a jury question.</u>

In addition to alleging they were unlawfully arrested, the Marescas also claim that Fuentes and Grundhoffer violated the Fourth Amendment by using excessive force when they arrested the Marescas. Because we treat claims for unlawful arrest and excessive force as separate causes of action, <u>see</u> <u>Cortez</u>, 478 F.3d at 1126-27, the Marescas' success on their unlawful arrest claim against Fuentes does not carry over to their excessive force claim against her; the same is true for Grundhoffer's qualified immunity defense. In considering the Marescas' excessive force claim, we consider whether the force the deputies used to arrest the Marescas exceeded "the force reasonably necessary to effect a <u>lawful</u> arrest or detention under the circumstances of the case." <u>Id.</u> at 1126 (emphasis added). For purposes of this section, we assume, for sake of argument, that Fuentes reasonably believed that the truck was stolen and thus had probable cause to arrest the Marescas.

> A police officer violates an arrestee's clearly established Fourth Amendment right to be free of excessive force during an arrest if the officer's arresting actions were not objectively reasonable in light of the facts and circumstances confronting him. This court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances. This reasonableness standard—which is "clearly established" for the purposes of § 1983 actions—implores the court to consider factors including the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest. Because the reasonableness inquiry overlaps with the qualified immunity

21

analysis, a qualified immunity defense is of less value when raised in defense of an excessive force claim.

Olsen v. Layton Hills Mall, 312 F.3d 1304, 1313-14 (10th Cir. 2002) (citations, internal quotation marks, alterations omitted); see also Graham v. Connor, 490 U.S. 386, 396 (1989).

We have held that the seizure of the Marescas was an arrest, but we note that even in an investigative detention, "officers are required to articulate specific justifications for uses of force . . . *such as locking a person in a police car*." Cortez, 478 F.3d at 1131 (emphasis added). In considering the reasonableness of a particular use of force, "personal security and individual dignity interests, particularly of non-suspects, should also be considered." Id. These interests are particularly vulnerable when the officers' use of force is directed at children, such as the three Maresca children arrested in this case.

*1. Factual disputes preclude summary judgment for party*

The Marescas presented evidence that the officers pointed loaded guns directly at them—including their children—despite their full compliance with the officers' orders. Specifically, there is evidence that deputies pointed a gun at C.M., held a weapon close to M.M., pointed a firearm at Mrs. Maresca's head, and aimed their weapons directly at Mr. Maresca. There is also evidence that the deputies continued to aim their weapons at the Marescas' vehicle after Mr. and Mrs. Maresca were removed from the vehicle and after the officers had been informed by the Marescas

22

that their children were still in the truck. The deputies deny these facts. These factual disputes preclude summary judgment for any party.

"The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." Holland, 268 F.3d at 1192. In Holland, we denied qualified immunity where, acting pursuant to lawful warrants, the officers "held each of the plaintiffs-appellees at gunpoint, initially forcing several of them to lie down on the ground for ten to fifteen minutes . . . ." Id.; see id. at 1196–97. Like the Marescas, the Holland plaintiffs fully complied with the officers' orders. Id. at 1197 ("The young people encountered by the SWAT deputies as they entered the Heflin property offered no resistance. They did as they were told. The SWAT deputies' initial show of force gained immediate and unquestioned control of the situation outside the residence. Thereafter, the justification for continuing to hold the young people directly at gunpoint simply evaporated.").

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

Id. at 1193. Additionally, as here, the officers in Holland allegedly pointed loaded guns at children who posed no risk to officer safety. "Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be

23

excessive under all the circumstances." Id. The officers attempt to distinguish Holland on the grounds that in that case, the officers continued to hold minors at gunpoint after they had been subdued—but the Marescas submitted evidence that this is exactly what happened here. Defendants presented evidence to the contrary, denying that any officer ever pointed a weapon directly at any member of the Maresca family, thus creating a genuine dispute of material fact.

Moreover, while the Marescas' evidence indicates it was primarily Deputies Swint and Quintana who pointed their weapons directly at members of the Maresca family, a jury could find that Fuentes and/or Grundhoffer was liable for not taking steps to stop the other deputies from using excessive force; it is clearly established "that a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983," Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996); accord Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir. 1985) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.").

Finally, a jury could also find that Fuentes and/or Grundhoffer used excessive force against M.M., depending on how the jury resolved the disputed facts as to the manner in which the deputies treated the nine-year-old and, in particular, whether the deputies made M.M. lie on the highway with her hands behind her back after the

24

deputies had removed all of the other Marescas from their vehicle and discovered that none of the older family members were armed or uncooperative. See Holland, 268 F.3d at 1192-93, 1196-97.

2. *The Marescas have presented evidence of more than* de minimis *injuries*

Finally, we reject the officers' argument that the Marescas' excessive force claim fails as a matter of law because any injuries the Marescas suffered were "*de minimis*." As an initial matter, it is not clear that a § 1983 excessive force claim raising excessive force issues beyond mere handcuff use would fail at the summary judgment stage if the plaintiff alleged and submitted evidence of only *de minimis* injury. Although Cortez stated that "[i]n order to recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional," 478 F.3d at 1129 n.25, Cortez was specifically addressing an excessive force claim premised on allegations that officers handcuffed the plaintiff too tightly and refused to adjust the handcuffs, see id. at 1128-29. Generally, since Cortez, the Tenth Circuit has required a showing of more than *de minimis* injury only in Fourth Amendment excessive force cases based on handcuffing. See, e.g., Koch v. City of Del City, 660 F.3d 1228, 1247-48 (10th Cir. 2011); Fisher v. City of Las Cruces, 584 F.3d 888, 897–99 (10th Cir. 2009). But see Aldaba v. Pickens, 777 F.3d 1148, 1153, 1161 n.3 (10th Cir. 2015) (suggesting, in dicta, that in a Taser case proof of actual, rather than *de minimis*, injury might have to be addressed on remand), petition for

25

cert. docketed, (U.S. June 19, 2015) (No. 14-1492); but see also Wilkins v. Gaddy, 559 U.S. 34, 34 (2010) (per curiam) (holding, in an Eighth Amendment context, that an inmate did not need to prove actual injury in an excessive force claim against a prison guard; stating that courts should "decide excessive force claims based on the nature of the force rather than the extent of the injury") (quoting Hudson v. McMillian, 503 U.S. 1, 4 (1992)).

Here, however, we need not decide whether the Marescas need to show more than *de minimis* injury because the Marescas presented evidence that each of them suffered psychological and emotional injury that significantly exceeded any *de minimis* requirement.[7]

---

[7] The Marescas alleged in their complaint that after the incident, nine-year-old M.M. began writing at school about being shot in the head and was diagnosed with post-traumatic stress disorder that was the result of this incident. At the summary-judgment stage, the Marescas claimed that each member of the family suffered emotional injury and they presented evidence that Deputy Swint pointed a gun at fourteen-year-old C.M. as he was lying on the highway, causing C.M. to cry and "freak[] out," stating "Mom, they are going to shoot us, they're going to shoot me" (Aplt. App. at 323); Deputy Quintana pointed a gun at Mrs. Maresca's head as she was lying prone on the highway, causing Mrs. Maresca to scream and cry for fear that she would be shot inadvertently; Anthony suffered nightmares for several weeks after the incident; the children (at least the nine- and fourteen-year-old) were crying during the felony stop; and after the incident, M.M. developed a fear of police officers, had "night terrors," and continually locked the doors to the family's home (id. at 328). Because emotional injury is sufficient to meet Cortez's requirement of actual injury, see Cortez, 478 F.3d at 1125 n.25, this evidence is sufficient to create at least a triable question as to whether each of the Marescas suffered more than *de minimis* injury. See also Holland, 268 F.3d at 1192-93, 1195.

*4. Conclusion: Factual disputes preclude summary judgment for any party on the excessive force claim*

Under Cortez, we must consider whether the Marescas have an excessive force claim that is separate from and in addition to their unlawful arrest claim. The reasonableness of the force used during an arrest ordinarily involves questions of fact for the jury. See Buck v. City of Albuquerque, 549 F.3d 1269, 1288 (10th Cir. 2008). That is the case here. Because there are genuine disputes of facts that are material to the question of whether the deputies used excessive force to arrest the Marescas— including whether the deputies pointed their weapons at members of the Maresca family and whether the deputies made nine-year-old M.M. lie on the highway with her hands behind her back—summary judgment is not appropriate on this claim for any party.

### III. CONCLUSION

Pursuant to the Marescas' request, Defendants Tonna, Swint, Quintana, and Lucero are DISMISSED from this appeal. As to the remaining Defendants, Deputies J. Fuentes and G. Grundhoffer, we hold as follows:

A. Fuentes:

> *i. Unlawful arrest claim*: We REVERSE summary judgment for Fuentes on the unlawful arrest claim and hold that she is not entitled to qualified immunity on that claim. We also REVERSE the denial of summary judgment for the Marescas on their unlawful arrest claim as to Fuentes and REMAND for entry of summary judgment in favor of the Marescas against Fuentes on the issue of

27

liability for the unlawful arrest. We REMAND that claim for further proceedings on the Marescas' damages for the unlawful arrest.

*ii. Excessive force claim:* We AFFIRM the district court's denial of the Marescas' motion for summary judgment on their separate excessive force claim. We REVERSE the grant of summary judgment for Fuentes on that claim. We REMAND that claim for further proceedings consistent with our opinion.

B. Grundhoffer:

*i. Unlawful arrest claim*: We AFFIRM the district court's grant of summary judgment to Grundhoffer on the unlawful arrest claim and hold that Grundhoffer is entitled to qualified immunity on that claim. We AFFIRM the district court's denial of the Marescas' motion for summary judgment on their unlawful arrest claim as to Grundhoffer.

*ii. Excessive force claim*: We AFFIRM the district court's denial of the Marescas' motion for summary judgment on their separate excessive force claim. We REVERSE the grant of summary judgment for Grundhoffer on that claim. We REMAND that claim for further proceedings consistent with our opinion.

We therefore AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.