Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/30/2021 12:10 AM CDT

State of Nebraska, appellee, v.
Arius L. Thomas, appellant.
___ N.W.2d ___

Filed February 5, 2021.    No. S-19-1163.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

3. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article 1, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

4. **Criminal Law: Search and Seizure: Appeal and Error.** In determining whether a seizure was reasonable, an appellate court balances the degree of the intrusion against the degree of objective certainty that the person stopped is or has been engaged in criminal activity.

5. **Police Officers and Sheriffs: Search and Seizure.** There are three distinct tiers of police-citizen encounters, each triggering a different analysis of the balance that should be struck between the government's interests and the invasion of privacy interests which a search or seizure entails.

6. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation

of the citizen is elicited through noncoercive questioning. This type of contact is outside the realm of Fourth Amendment protection.

7. **Police Officers and Sheriffs: Investigative Stops: Weapons.** The second tier of police-citizen encounters, the investigative stop, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning.

8. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Search and Seizure.** A second-tier encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards; but because of its less intrusive character, it requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.

9. **Police Officers and Sheriffs: Search and Seizure: Arrests.** The third tier of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention.

10. **Constitutional Law: Criminal Law: Arrests: Probable Cause.** The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

11. **Search and Seizure: Investigative Stops: Arrests.** The line between a second-tier encounter, or investigatory stop, and a third-tier encounter, or de facto arrest, is sometimes difficult to draw, and it depends on all the surrounding circumstances.

12. **Police Officers and Sheriffs: Search and Seizure: Time.** Several circumstances are deemed relevant to the analysis of whether a seizure is a second-tier or third-tier encounter, including (1) the law enforcement purposes served by the detention, (2) the diligence with which law enforcement pursues the investigation, (3) the scope and intrusiveness of the detention, and (4) the duration of the detention.

13. **Criminal Law: Police Officers and Sheriffs: Search and Seizure: Investigative Stops: Arrests: Motor Vehicles.** The fact that a detention may be considered investigative is not decisive on whether it is a second-tier encounter. The police may not carry out a full search of a person, or his or her vehicle, who is no more than suspected of criminal activity, nor may the police attempt to verify their suspicions by means that approach the circumstances of an arrest.

14. **Police Officers and Sheriffs: Investigative Stops: Time.** An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, and the methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

15. **Investigative Stops: Arrests: Time.** If unreasonable force is used or if it lasts for an unreasonably long period of time, then an investigatory detention may turn into a de facto arrest.

16. **Criminal Law: Police Officers and Sheriffs: Investigative Stops.** Whether a detention was reasonable under the circumstances depends on a multitude of factors, including (1) the number of officers and police vehicles involved; (2) the nature of the crime and whether there is a reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

17. **Police Officers and Sheriffs: Investigative Stops: Motor Vehicles: Weapons.** Where the facts available to a law enforcement officer would warrant a person of reasonable caution in the belief that an occupant of a vehicle is armed and dangerous and that the use of forceful techniques, including blocking the vehicle and displaying firearms when ordering the occupants out of the vehicle, are reasonably necessary to protect the officer's personal safety, the use of such techniques does not necessarily transform a second-tier encounter into a third-tier encounter.

18. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.

19. **Police Officers and Sheriffs: Investigative Stops: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.

20. ____: ____: ____. Information known to all of the police officers acting in concert can be examined when determining whether the officer initiating the stop had reasonable suspicion to justify a stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

21. **Criminal Law: Police Officers and Sheriffs: Investigative Stops: Motor Vehicles: Probable Cause: Time.** The passage of time since the crime was committed is only a factor to consider when determining whether officers' stopping a vehicle pursuant to information in a police bulletin had reasonable suspicion, based on specific and articulable facts, to justify a second-tier encounter.

22. **Police Officers and Sheriffs: Investigative Stops: Probable Cause: Time.** While the passage of time is a relevant factor to consider in an analysis of whether officers had reasonable suspicion to support a second-tier encounter, as particularity of the description increases, the effects of delay decrease.

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Travis L. Wampler for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## NATURE OF CASE

The defendant challenges the district court's denial of his motion to suppress evidence found in his vehicle during a felony traffic stop that was based upon law enforcement's belief that the vehicle matched the description in a police bulletin of a vehicle used in a shooting committed 3 days earlier. The defendant argues that a police bulletin regarding a crime completed 3 days prior and without a description of the suspect was insufficient to justify the intrusion of the felony traffic stop. We affirm.

## BACKGROUND

Following a jury trial, Arius L. Thomas was convicted of possession of a firearm by a prohibited person, a Class ID felony; possession of a controlled substance, a Class IV felony; and possession of marijuana, more than 1 ounce, a Class III misdemeanor. Thomas was sentenced to 5 to 10 years' imprisonment on count 1, 2 years' imprisonment on count 2, and 3 months' imprisonment on count 3. These sentences were ordered to run consecutively, and Thomas was given credit for 397 days served against count 1.

The convictions arise out of a stop of the vehicle Thomas was driving on October 22, 2018, based upon information contained in a police bulletin from a shots-fired incident 3 days earlier near 25th and Maple Streets in Omaha, Nebraska. During the investigation of the shots-fired incident, law enforcement obtained a video of the suspect vehicle from a surveillance camera located near the scene. The vehicle image captured

on the surveillance video was "dark gray in color with damage to the rear driver's side [and] possibly identified as a 2010 Mazda 3." This information, together with a still shot of the vehicle from the surveillance video and a reference image of a 2010 Mazda 3, was included in a police bulletin.

On October 22, 2018, a police sergeant observed a vehicle parked in the area of 24th and Maple Streets that matched the description of the vehicle involved in the shots-fired incident on October 19. It was the same make, model, and color, and it had the same distinct damage to the rear driver's side as shown in the photograph contained in the police bulletin. The police sergeant notified the officers in the north Omaha gang unit of the location of the suspect vehicle and requested assistance in its surveillance. Five police officers, including Chad Frodyma and Cortes Clark, reported to assist in the surveillance. A check of the vehicle's license plates revealed that the vehicle was registered to Thomas.

After approximately 3 hours of observation by the officers, an individual entered the vehicle. This person was later identified as Thomas. The officers continued surveillance of the vehicle as it left the area. As the vehicle approached the intersection of 72d Street and Ames Avenue, Frodyma observed the vehicle make what he thought to be an improper lane change, moving from the right-turn lane to the left-turn lane over the solid white line separating the two lanes. However, a traffic stop was not immediately made due to officer safety concerns based upon the suspicion that this vehicle had been involved in a shots-fired incident and the occupant could be armed.

The officers continued following the vehicle until it pulled into an apartment complex parking lot. At that point, the officers conducted what they described as a felony traffic stop. They activiated the emergency lights on their vehicles and exited them with their weapons drawn. The officers then commanded Thomas to put his hands out of the window and open the door from the outside so he could exit the vehicle. Thomas put his hands out of the window, but he refused to get out of the vehicle.

Within seconds, officers approached the driver's side of the vehicle, weapons still drawn, and attempted to pull Thomas out of the vehicle through the window. Thomas continued to resist while officers were trying to grab his hands to remove him from the vehicle. Frodyma could see Thomas pull his right hand back into the vehicle and reach between his legs and under the driver's seat. Frodyma believed Thomas was possibly reaching for a weapon, so he deployed his Taser on Thomas. Thereafter, Thomas was removed from the vehicle, where he was placed on the ground and handcuffed.

After Thomas was removed from the vehicle, officers observed through the windshield and the driver's side window the butt of a handgun under the driver's seat. Thomas was searched, and $522 cash in small denominations was found on his person. Based on the observation of the handgun, officers conducted a search of the rest of the vehicle and located a backpack in the back seat with 41 grams of marijuana, multiple alprazolam pills, plastic baggies, and a digital scale.

Prior to trial, Thomas filed a motion to suppress the evidence found on his person and in the vehicle, asserting that "the arresting officers lacked probable cause and/or reasonable suspicion to conduct a 'felony traffic stop' and illegally detain [Thomas]; and further, the arresting officers conducted a warrantless search of [Thomas'] property and persona" and "all evidence obtained as a result of this illegal traffic stop, detention, and search" should be suppressed.

At the suppression hearing, Frodyma testified to the facts as previously set forth regarding the incident on October 22, 2018. Clark testified similarly, but stated he did not personally see Thomas commit a traffic violation; his observations of Thomas' vehicle were obstructed at times by other vehicles.

After the hearing, the court overruled Thomas' motion to suppress. The court found that any inconsistencies in the officers' testimonies regarding whether a traffic violation occurred could be used at trial to challenge their credibility on the matter. The court did not explicitly make findings of fact that

a traffic violation actually occurred, but generally noted that "a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle." Further, the court found that, in considering the totality of the circumstances, based on the information obtained from the surveillance video related to the shots-fired incident, "the officers had probable cause to conduct an investigative stop of [Thomas'] vehicle."

At trial, Thomas renewed the motion to suppress. The State offered substantially similar evidence regarding the events of October 22, 2018, from the perspective of multiple officers. The district court acknowledged that the motion to suppress was heard on May 29, 2019, and that the order overruling the motion was entered on August 2. It again overruled the motion, but made no additional findings of fact.

## ASSIGNMENT OF ERROR

Thomas assigns that the trial court erred in denying Thomas' motion to suppress.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[1] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[2]

[2] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[3]

---

[1] See *State v. Cox*, 307 Neb. 762, 950 N.W.2d 631 (2020).

[2] See *id*.

[3] *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019).

## ANALYSIS

[3] Thomas assigns that the trial court erred in overruling his motion to suppress evidence that was allegedly obtained as the fruit of an illegal seizure in violation of the Fourth Amendment. Both the Fourth Amendment to the U.S. Constitution and article 1, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.[4]

Thomas is challenging on appeal only the lawfulness of the stop. He does not specifically challenge the justification for the stop's escalation after he resisted officers' commands, whether a weapon was in plain view after he was removed from the vehicle, or whether the officers were justified in searching the vehicle after seeing the weapon.

[4] In determining whether a seizure was reasonable, we balance the degree of the intrusion against the degree of objective certainty that the person stopped is or has been engaged in criminal activity.[5] We hold that the officers who stopped Thomas employed a reasonable threat of force in light of a reasonable belief that the driver of the suspect vehicle could be armed or dangerous. Accordingly, and in light of all the other surrounding circumstances, the initial seizure was a tier-two encounter. Only reasonable suspicion was required to justify the seizure, and we conclude that the officers had a particularized and objective basis for suspecting Thomas of breaking the law.[6] Therefore, the district court did not err in denying Thomas' motion to suppress.

## Initial Detention

[5] There are three distinct tiers of police-citizen encounters, each triggering a different analysis of the balance that

---

[4] *State v. Briggs, ante* p. 84, ___ N.W.2d ___ (2021).

[5] See *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993).

[6] See *Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014).

should be struck between the government's interests and the invasion of privacy interests which a search or seizure entails.[7]

[6] The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through non-coercive questioning.[8] This type of contact is outside the realm of Fourth Amendment protection.[9]

[7,8] The second tier, the investigative stop, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning.[10] It is an intermediate response.[11] A second-tier encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards; but because of its less intrusive character, it requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.[12]

[9,10] The third tier of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention.[13] The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.[14]

[11,12] The line between a second-tier encounter, or investigatory stop, and a third-tier encounter, or de facto arrest, is sometimes difficult to draw, and it depends on all the surrounding circumstances. In distinguishing a second-tier encounter from a third-tier encounter, "'we must not adhere to "rigid

---

[7] See *State v. Van Ackeren, supra* note 5 (quoting *United States v. Armstrong*, 722 F.2d 681 (11th Cir. 1984)).

[8] *Van Ackeren, supra* note 5.

[9] See *id*.

[10] *Id*.

[11] See *Van Ackeren, supra* note 5.

[12] *Id*. (quoting *Armstrong, supra* note 7).

[13] *Id*.

[14] *Id*.

time limitations" or "bright line rules," . . . but must use "common sense and ordinary human experience."'"[15] Several circumstances are deemed relevant to the analysis of whether a seizure is a second-tier or third-tier encounter, including (1) the law enforcement purposes served by the detention, (2) the diligence with which law enforcement pursues the investigation, (3) the scope and intrusiveness of the detention, and (4) the duration of the detention.[16]

[13,14] The fact that a detention may be considered investigative is not decisive on whether it is a second-tier encounter. The police may not carry out a full search of a person, or his or her vehicle, who is no more than suspected of criminal activity, nor may the police attempt to verify their suspicions by means that approach the circumstances of an arrest.[17] What is permitted for police to verify their suspicions will vary based on the particular facts and circumstances; but, certainly, "'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop'" and the "'methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'"[18]

The police sergeant and two officers, Frodyma and Clark, testified that they employed felony traffic stop measures in stopping Thomas. These involve staying in a position of safety away from the suspect vehicle with weapons drawn and verbally ordering the occupants to exit the suspect vehicle with their hands up and to walk backward toward the officers. The police do this as a precautionary measure when there is reason to believe that a person in a vehicle is armed or dangerous.

The U.S. Supreme Court has not yet specifically addressed such felony traffic stop procedures. But, in the seminal

---

[15] *Van Ackeren, supra* note 5. Accord *United States v. Sharpe*, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985).

[16] See *Van Ackeren, supra* note 5.

[17] See *id.*

[18] *Id.* at 487, 495 N.W.2d at 637.

second-tier case of *Terry v. Ohio*,[19] there was some use of force. The officer grabbed the defendant, spun him around, and patted him down, believing he was involved in criminal activity and possibly armed. Despite this use of force, the U.S. Supreme Court held that the intensity and scope of the seizure was not that of an arrest, but was what we now describe as a second-tier encounter. The Court held that regardless of whether an officer has reasonable cause to arrest an individual for a crime, where a reasonable officer would be warranted in the belief that the safety of the officer or others is in danger, a protective search and seizure for weapons is reasonable so long as it is confined in scope to an intrusion reasonably designed to achieve its purpose, or "strictly circumscribed by the exigencies which justify its initiation."[20]

While not discussing the type of felony traffic stop procedures here presented, we have similarly found seizures to be second-tier encounters despite intrusions going somewhat beyond a typical investigatory stop, when the facts justified a reasonable belief that an officer or public safety was in danger.[21] In *State v. Wells*,[22] we explained that the use of handcuffs does not transform a tier-two encounter into a tier-three encounter when using handcuffs is reasonably necessary to protect officer safety during an investigative stop, but that using handcuffs will transform the tier-two encounter into tier-three encounter when the facts do not justify a belief that the suspect may be dangerous.

[15,16] We said that, generally, if unreasonable force is used or if it lasts for an unreasonably long period of time, then an investigatory detention may turn into a de facto arrest.[23]

[19] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[20] *Id.*, 392 U.S. at 26.

[21] See, *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019); *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). See, also, *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

[22] *State v. Wells, supra* note 21.

[23] *Id.*

Whether a detention was reasonable under the circumstances depends on a multitude of factors, including (1) the number of officers and police vehicles involved; (2) the nature of the crime and whether there is a reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.[24] In *Wells*, noting the nature of the suspected crime of narcotics trafficking and that the defendant was digging in his pocket and concealing his right arm, we found that the officers' decision to gain control of the defendant's arm and handcuff him for a short time while conducting the investigation was a reasonable precaution and did not escalate the encounter to a tier three.

Similarly, in *State v. Shiffermiller*,[25] we held that the use of handcuffs and a 30-to-40 minute investigation of a reported assault did not amount to third-tier encounter because this initial detention was not unreasonable, highly intrusive, or excessive in length. In *Shiffermiller*, an officer responded to a report that two individuals were fighting. The officer who arrived on scene observed the defendant, with a torn shirt and blood on his face, arm, and knuckles, walking toward a parked car with its trunk open. When the officer approached the defendant and asked about the reported altercation, the defendant appeared to be angry, agitated, and under the influence of drugs or alcohol. Three more officers then arrived on scene. When the defendant stated he wanted to leave, the officers told him he was not free to leave until the situation was investigated. Due to the defendant's being agitated, uncooperative, and appearing to be under the influence of drugs or alcohol, officers placed the defendant in handcuffs and seated him on the curb while

---

[24] *Id.* See, also, *United States v. Jones*, 759 F.2d 633, 639-40 (8th Cir. 1985).

[25] *Shiffermiller, supra* note 21.

they searched for the other party involved in the reported fight. We held that the officers did not exceed the scope of a second-tier encounter. While the officers may not have had any indication that the defendant was armed, the circumstances justified the use of some sort of control to ensure that the defendant did not attempt to leave during the investigation and to ensure that he was not a danger to himself or others throughout the investigation.[26]

Other jurisdictions have more directly addressed procedures involving felony stops or felony traffic stops and have indicated that the use of reasonable force or threat of force does not transform a second-tier encounter into a third-tier encounter so long as the facts justify a reasonable belief that the suspect may be armed or dangerous.[27] These jurisdictions distinguish felony stops from third-tier encounters by acknowledging that felony stop procedures are used when the circumstances warrant such measures in order for officers to safely conduct a second-tier stop.[28]

The 10th Circuit Court of Appeals has analyzed on multiple occasions when forceful techniques used by police officers transform a second-tier encounter into a third-tier encounter, and its comparisons are helpful in this case. In *U.S. v. Shareef*,[29] the court held that a display of firearms, removing occupants from three stopped vehicles, and frisking and handcuffing them did not transform the second-tier encounter into a third-tier enounter because of the officers' reasonable belief that one of the motorists was armed and dangerous. Similarly, in *U.S. v. Perdue*,[30] the court held that the fact that

[26] *Id*.

[27] See, e.g., *Maresca v. Bernalillo County*, 804 F.3d 1301 (10th Cir. 2015); *U.S. v. Gomez*, 623 F.3d 265 (5th Cir. 2010); *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006).

[28] See, *Maresca, supra* note 27; *Smoak, supra* note 27.

[29] *U.S. v. Shareef*, 100 F.3d 1491 (10th Cir. 1996).

[30] *U.S. v. Perdue*, 8 F.3d 1455 (10th Cir. 1993).

two officers removed two occupants from a vehicle at gunpoint in a remote area and made them lie on the ground did not transform the second-tier encounter into a third-tier encounter, where officers reasonably believed occupants were armed and dangerous.

In contrast, in *Maresca v. Bernalillo County*,[31] the 10th Circuit Court of Appeals concluded that under the circumstances, the felony stop procedures were unreasonable and therefore transformed a second-tier encounter into a third-tier encounter.[32] Two officers driving separate cars had pulled the driver and his family over and, with the assistance of more officers called to the scene, conducted a felony traffic stop when the officer believed that the vehicle was stolen. But there was no information regarding the theft that indicated any weapons were involved. The stop was along a highway in broad daylight, and the family fully cooperated and complied with every directive. The court determined that the actions the officers took—ordering the family out of their truck at gunpoint, requiring them to lift their clothes for the officers to check their waistbands for weapons, forcing them to lie face down on the highway, and handcuffing four of them and locking them in separate patrol cars—effected an arrest because the deputies had no objectively reasonable basis to believe that such forceful measures were necessary for them to conduct the investigative detention.[33]

[17] We hold that where the facts available to a law enforcement officer would warrant a person of reasonable caution in the belief that an occupant of a vehicle is armed and dangerous and that the use of forceful techniques, including blocking the vehicle and displaying firearms when ordering the occupants out of the vehicle, are reasonably necessary to protect the officer's personal safety, the use of such techniques does

---

[31] *Maresca, supra* note 27.

[32] See, also, *U.S. v. Melendez-Garcia*, 28 F.3d 1046 (10th Cir. 1994).

[33] *Maresca, supra* note 27.

not necessarily transform a second-tier encounter into a third-tier encounter. Such techniques, designated here as a "felony traffic stop," may under the circumstances be the least intrusive means reasonably available to verify or dispel the officer's suspicion.

That said, the tier of the encounter is determined by all of the circumstances, including the law enforcement purposes served by the detention, the diligence with which law enforcement pursues the investigation, the scope and intrusiveness of the detention, and the duration of the detention.[34] And, in analyzing whether a threat or use of force transforms a tier-two encounter into a tier-three encounter, we consider the number of officers and police vehicles involved; the nature of the crime and whether there is a reason to believe the suspect might be armed; the strength of the officers' articulable, objective suspicions; the erratic behavior of or suspicious movements by the persons under observation; and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.[35]

In this case, the officers looked for a vehicle matching a description in the police bulletin of the vehicle involved in the crime and observed one such vehicle near the scene of the crime. After Thomas drove off in the vehicle, officers followed it until it could be stopped safely. The crime under investigation was a shots-fired incident 3 days earlier, and the weapon used during the incident had not been recovered. To approach the vehicle safely to conduct their investigation of the crime, the officers blocked Thomas' vehicle in, stayed in a position of safety near their vehicles with weapons drawn, and commanded Thomas to put his hands out the window of his vehicle, open the door from the outside, and exit the vehicle. We find that the purpose served by the detention was a temporary seizure for investigatory purposes and that law enforcement

---

[34] See *Van Ackeren, supra* note 5.

[35] See *Wells, supra* note 21. See, also, *Jones, supra* note 24.

pursued its investigation diligently. Further, the scope and intrusiveness of the investigatory detention was justified by the officers' reasonable belief that the driver might be armed, and it did not exceed the scope circumscribed by that exigency. The seizure was a tier-two encounter.

## Reasonable Suspicion

[18,19] Having determined that the felony traffic stop in this case was a tier-two police-citizen encounter, we now examine whether, under the totality of the circumstances, the officers had reasonable suspicion. Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.[36] Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.[37] The totality of the circumstances analysis is based on an objective standard.[38]

[20] At the time Thomas' vehicle was put under surveillance, officers were aware of the information in the police bulletin that a vehicle matching the make, model, and distinctive damage to the rear driver's side of Thomas' vehicle was involved in the crime 3 days before. The fact that the officers had no personal knowledge regarding the specific circumstances of the shots-fired incident is irrelevant, because this court has adopted the collective knowledge doctrine. "'[I]nformation known to all of the police officers acting in concert can be examined when determining whether the officer initiating the stop had reasonable suspicion to justify a *Terry* stop.'"[39]

Thomas concedes that reasonable suspicion may be based on a vehicle description alone when in relation to a crime

---

[36] *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020).

[37] *Id.*

[38] See *Terry, supra* note 19.

[39] *State v. Wollam*, 280 Neb. 43, 57, 783 N.W.2d 612, 624 (2010).

that is afoot. Nevertheless, Thomas argues that the 3-day span of time since the incident made the vehicle description, especially when it lacked a description of the suspect, insufficient to establish reasonable suspicion for the seizure in this case. We disagree.

In *U.S. v. Marxen*,[40] the Sixth Circuit Court of Appeals rejected a similar argument that since 11 days had passed since the robbery, "any reasonable suspicion that the officers possessed . . . had evaporated." In *Marxen*, two individuals, described by witnesses, committed an armed robbery of a convenience store. Witnesses also described the vehicle the robbers were driving, along with the license plate number of the vehicle. Based on the license plate number, police determined the defendant owned the vehicle described, but the defendant did not match the description of either robber. The defendant was placed under surveillance and did nothing suspicious nor did he meet with any individuals fitting the description of the robbers during this surveillance. Eventually—11 days after the robbery and 6 days after the defendant was placed under surveillance—police stopped the defendant by blocking his vehicle with several police cars. Even though the defendant had not committed any traffic violations, the defendant was removed from the driver's seat of the vehicle and placed in handcuffs while the officers conducted their investigation.

The trial court in *Marxen* had granted the defendant's motion to suppress evidence found during the course of the stop, on the grounds that the police lacked reasonable suspicion. But the Sixth Circuit Court of Appeals reversed. The court determined that the passage of time did not negate the justification for the stop, but is only a factor to consider when determining whether the officers had reasonable suspicion, based on specific and articulable facts, that the defendant's vehicle had been involved in criminal activity. The court reasoned that because the police officers were reasonably certain of the make, model, and general color of the vehicle

---

[40] *U.S. v. Marxen*, 410 F.3d 326, 330 (6th Cir. 2005).

used in the robbery; the description matched the defendant's vehicle; and the license plate number of the getaway vehicle matched the license number of the defendant's vehicle, under the totality of the circumstances, the officers had reasonable suspicion to believe that the defendant's vehicle was involved in the robbery.

In reversing the suppression of the evidence by the trial court in *Marxen*, the Sixth Circuit Court of Appeals concluded that police are allowed to conduct investigatory stops for "completed felonies" if there is reasonable suspicion to believe that the vehicle was involved in criminal activity.[41] This investigatory stop is allowed "even if officers do not have reasonable suspicion to believe that the owner and/or driver of the vehicle was directly involved in the criminal activity."[42]

[21,22] We agree that the passage of time since the crime was committed is only a factor to consider when determining whether officers' stopping a vehicle pursuant to information in a police bulletin had reasonable suspicion, based on specific and articulable facts, to justify a second-tier encounter. While the 3-day passage of time in this case is a relevant factor to consider in determining whether the officers had reasonable suspicion to stop Thomas, "[a]s particularity of the description increases, the effects of delay decrease."[43]

A generic description of a dark gray 2010 Mazda 3 may not have been sufficient to conduct a felony traffic stop of every vehicle in Omaha matching that description, but we need not determine that here based on these facts. Here, the still shot of the suspect vehicle from the surveillance video showed distinctive damage to the rear driver's side. This provided a more exact detail for the officers to look for in locating a particular vehicle regardless of the time that had passed since the shots-fired incident. The fact that the vehicle so specifically

---

[41] *Id.* at 332.

[42] *Id.*

[43] See *United States v. Jackson*, 700 Fed. Appx. 411, 416 (6th Cir. 2017).

matched the photograph and description in the police bulletin, along with the fact that it was initially located within a block of where the shots-fired incident occurred, provided reasonable suspicion to conduct an investigatory stop of the vehicle. Under these circumstances, a particular description of the suspect who committed the prior shooting was not required to justify the tier-two stop.

Since the officers had reasonable suspicion to conduct an investigatory stop of Thomas' vehicle based on the police bulletin alone, we need not determine whether the encounter was justified by the observation of a traffic violation.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

Affirmed.