IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. PETTIES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JAMAL T. PETTIES, APPELLANT.

Filed December 21, 2021.    No. A-21-301.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

W. Randall Paragas, of Paragas Law Offices, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Following a stipulated bench trial in the Douglas County District Court, Jamal T. Petties was convicted of possession of marijuana with the intent to distribute and was sentenced to 18 months' supervised probation. Petties has appealed challenging the district court's denial of his motion to suppress related to the investigative traffic stop and the subsequent searches of his person and his vehicle. Petties argues that officers did not have a sufficient basis to conduct the stop in violation of his constitutional rights and evidence obtained should have been suppressed as fruit of the poisonous tree. For the reasons stated herein, we affirm.

## STATEMENT OF FACTS

Prior to the traffic stop which is the subject of the motion to suppress, the Douglas County Police Department obtained information from a confidential informant (CI) that Petties was

dealing large quantities of marijuana. After receiving this information, Officer Troy Liebe conducted an independent investigation and learned that Petties' criminal history included drug transactions and firearm possession and that Petties was a known gang member. On the day of the investigative stop, officers including Officer Liebe and Officer Cortes Clark were conducting routine probation surveillance in a high crime area and became suspicious of two vehicles parked outside of a tobacco hut away from the store's main entrance near the dumpsters.

After identifying one of the occupants as Petties, and as a result of officers' suspicions that the individuals in the vehicles were participating in a drug transaction, the officers approached the vehicles. Officer Liebe noted that Petties, who was the driver of one of the vehicles, began acting frantically. Officer Liebe unholstered his service weapon and demanded that Petties exit the vehicle. When Petties exited the vehicle, officers could smell the odor of marijuana coming from Petties and his vehicle. A search of both Petties and his vehicle uncovered marijuana. Petties was arrested and charged with possession of marijuana with intent to distribute, a Class IIA felony.

Petties filed a motion to suppress evidence obtained as a result of the stop, seizure, detention, arrest, and questioning of him. Petties alleged that officers did not have probable cause to believe a traffic violation occurred or reasonable suspicion that criminal activity had occurred or was occurring, that the traffic stop was unlawful, that Petties was detained longer than necessary to effectuate the stop and officers did not have reasonable suspicion to continue or expand the stop, that officers lacked probable cause or consent to search the vehicle, and that any statements made by Petties were a result of the unlawful detention.

At the suppression hearing, the issues before the court were narrowed to the stop and search of Petties and his vehicle. The State called the arresting officers, Officers Liebe and Clark. Officer Liebe testified that 30 days prior to Petties' arrest, he was working with a reliable CI who provided information that Petties was a known drug dealer of large quantities and the CI indicated that he could likely obtain 2 pounds of marijuana by doing a controlled purchase with Petties. Officer Liebe testified that, under his direction, this CI had participated in controlled purchases on several prior occasions. Although Officer Liebe was unable to execute a controlled purchase from Petties due to time constraints and coordination, he independently corroborated the information provided by the CI through his own investigation which revealed Petties was a major drug dealer, was a known "South Family Blood" gang member, had a significant history of dealing drugs and possessing firearms, and had a criminal history of charges involving possession with intent to distribute.

Officers Liebe and Clark both testified to the events that gave rise to the arrest of Petties and the subsequent search. The officers testified that, on the day of Petties' arrest, they, along with Officer Jordan Brandt, were conducting surveillance on an unrelated probationer in a high crime and drug activity area. While surveilling the area, the officers observed a Chevy Impala and a Dodge Charger pull into a tobacco hut parking lot next to a dumpster. Both officers noted that it was common for drug deal exchanges to occur in parking lots of gas stations, tobacco huts, and convenience stores and that it was common for one individual to get out of one vehicle and enter another vehicle for a very short period of time. The officers then conducted a data check on the Charger's license plate number which revealed that it was registered to Petties. The Impala did not have license plates. Officer Clark recognized Petties' Charger because he went to high school with

Petties and he was personally and professionally aware that Petties was involved in gang activity and was a documented gang member.

As the officers continued to observe the two vehicles, they witnessed the Impala passenger exit the vehicle and enter Petties' front passenger seat and remain there for approximately 30 to 60 seconds. At this time, Officer Liebe, based off his training and experience, believed that this action was indicative of a drug transaction. Officer Liebe testified that the basis for his suspicion arose from numerous factors including that the cars parked next to each other in a parking lot of a tobacco hut away from the entrance near the dumpsters, that one individual exited the vehicle and entered the other briefly, that he received prior information about Petties from a reliable CI, the data check confirmed that Petties was the owner of the vehicle the individual entered, the events occurred in a high crime area specifically related to drug deals, and from his training and experience as a police officer. Based on that information, Officer Liebe stated he reasonably believed a narcotics exchange was likely occurring and he decided to approach the vehicle to determine what was happening inside the vehicle. Although Officer Liebe testified that it is possible the behavior could have been lawful or innocent behavior, he stated that is why he decided to approach the vehicles and see what was occurring.

Officer Liebe testified that all three officers exited the unmarked police vehicle and initiated each of their body cameras and microphones on their vests. As officers began to approach the vehicles with their firearms holstered, the passenger exited Petties' vehicle and headed back toward the Impala. As the passenger was walking back toward the Impala, Officer Brandt stopped, handcuffed, and searched the passenger. Officer Liebe approached the driver side of Petties' vehicle and, through the vehicle's tinted window, observed a "wide-eyed" Petties hurriedly stuffing something down the front of his waistband. Officer Liebe unholstered his gun and ordered Petties to show his hands and exit the vehicle. Officer Liebe stated that he drew his weapon for safety reasons because he knew Petties' history and he was unsure whether Petties was concealing narcotics or a firearm in his waistband. Officer Liebe opened the car door and when Petties exited the vehicle, Officer Liebe stated that he could smell the odor of marijuana emanating from Petties and the vehicle. Thereafter, Petties was placed in handcuffs and Officer Liebe conducted a pat down of Petties focusing on Petties' waistband to determine what he had been attempting to conceal. Officer Liebe asked Petties whether he had marijuana in his groin area and how much he had stuffed there. Petties responded that he had stuffed about 1 ounce of marijuana into his pants. Officer Liebe seized $3,784 in cash out of Petties' pockets. Due to the placement of the marijuana, Petties was then transported to the Nebraska Precinct Assembly for a strip search. That search revealed a larger baggie containing 40.79 grams of marijuana. The larger baggie contained nine smaller baggies which each weighed approximately the same amount. A search of Petties' vehicle revealed a freshly rolled blunt.

The passenger, who was also detained at the scene, admitted to having marijuana in his pocket. After searching the passenger's pocket, the officer located a package containing marijuana that was later compared to the packages found on Petties. The marijuana found on the passenger was similar in weight and packaging to the nine individual packages found on Petties. The defense did not present any evidence.

The district court overruled Petties' motion to suppress. The court considered the two issues presented: (1) whether the initial stop was lawful and (2) whether the searches of Petties and his vehicle were lawful. The district court classified the initial stop as a tier-2 encounter, not a tier-3 arrest, requiring only reasonable suspicion to support the investigatory stop. To that end, the court found the officers had reasonable suspicion to conduct an investigatory stop in the following particulars:

First, the officers were surveilling the area and observed . . . Petties in the parking lot at the "Hut" known to be a high-crime area where drug deals are a known occurrence. Second, the officers observed that the Chevy Impala had no license plates. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019) (holding the stop "was based on a reasonable suspicion, because before they made the stop, the police officers did not see license plates or visible in-transit tags. The fact that in-transit tags became visible as the police approached the vehicle on foot does not invalidate the reasonable suspicion that justified the initial traffic stop.") Third, the vehicles were parked right next to each other and one person exited the Chevy Impala, entered the Dodge Charger's passenger side, and remained for approximately 30 seconds and exited the Dodge Charger. The articulated behavior is highly suspicious of drug activity. Fourth, officers conducted a data check on license plate . . . and the results of the data check revealed that . . . Petties was the registered owner of the Dodge Charger. Fifth, Officer Clark recognized . . . Petties' vehicle. Officer Clark went to high school with . . . Petties and they grew up together. Officer Clark knows . . . Petties to be involved in gang activities and he knows him professionally as a documented gang member. Sixth, Officer Liebe testified that thirty days prior to June 5, 2019[,] he was working with a [CI] who informed him that . . . Petties was a known drug dealer. The [CI] informed Officer Liebe that . . . Petties dealt with large quantities of marijuana and he felt confident that . . . Petties could sell him upwards of two pounds of marijuana. After speaking with the [CI,] Officer Liebe conducted his own investigation on . . . Petties. Seventh, Officer Liebe's independent investigation corroborated the [CI's] articulation that . . . [Petties] is a major drug dealer. Officer Liebe corroborated that . . . Petties has a significant history of dealing drugs and possessing firearms. Specifically, Officer Liebe's research concluded that . . . Petties has a criminal history of possession with intent to distribute controlled substances. Officer Liebe gleaned from his independent investigation that . . . Petties was a known "South Family Blood" gang member. Eighth, when Officer Liebe approached the driver's side of the Dodge Charger . . . Petties looked at Officer Liebe wide eyed and frantically started stuffing something down the front of his pants. At the time, Officer Liebe was unaware as to what . . . Petties was stuffing down his pants. Detective Liebe gave a loud verbal command for . . . Petties to stop, but he did not stop. Officer Liebe then drew his service firearm as did Officer Clark who was unable to see . . . Petties from his vantage point. Ninth, when Officer Liebe was removing . . . Petties from the vehicle he smelled an odor of marijuana emanating from the vehicle. The Court examines these factors individually and together, and determines that they do rise to a showing of reasonable suspicion on the totality of the circumstances, which include . . . Petties' prior drug charges, criminal history, the location of the parked vehicles in a known

- 4 -

area of crime and drug activity, and the behavior of the parties the officers had reasonable suspicion, based upon sufficient, articulable facts, that . . . Petties was involved in a drug transaction, despite the fact that no law enforcement officer actually observed the controlled substance or money changing hands.

The court then reviewed the searches of Petties and his vehicle and determined that the totality of the circumstances led Officer Liebe to objectively and reasonably believe that, due to Petties' furtive movements, a pat down of Petties was necessary for officer safety. Further, the court found that, based upon the smell of marijuana emanating from Petties and his vehicle, and from Petties' frantic attempt to conceal something in his pants, probable cause existed that the vehicle contained evidence or contraband. Therefore, the court determined that the search met the requirement under the automobile and plain view exceptions to the search warrant requirement.

After finding that the initial stop of the vehicle was supported by reasonable suspicion, and that the pat down of Petties and search of his vehicle were lawful under exceptions to the warrant requirement, the court overruled Petties' motion to suppress. The case proceeded to a stipulated bench trial and Petties preserved the issues raised in his motion to suppress. The district court found Petties guilty of possession of marijuana with the intent to distribute. Thereafter, the district court sentenced Petties to 18 months' supervised probation and ordered him to surrender the money recovered by law enforcement at the time of his arrest. Petties timely appeals to this court.

## ASSIGNMENT OF ERROR

Petties' sole assignment of error is that the district court erred in denying his motion to suppress because evidence was obtained in violation of his constitutional rights requiring suppression of all evidence under the fruit of the poisonous tree doctrine.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Petsch,* 300 Neb. 401, 914 N.W.2d 448 (2018). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Petsch, supra.*

The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Montoya*, 29 Neb. App. 563, 957 N.W.2d 190 (2021).

When a motion to suppress is denied pretrial and again during trial on renewed objection, the appellate court considers all evidence, both from trial and from the hearing on motion to suppress. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

ANALYSIS

Petties contends that officers did not have reasonable articulable suspicion prior to initiating the stop and, consequently, the evidence obtained therefrom should have been suppressed. He contends that

> [t]he moment [the officers] chose to abandon their scheduled duties and approach [Petties'] car, the officers lacked the reasonable suspicion necessary to create the conditions that would make a reasonable person feel unable to freely leave the situation and violated [Petties'] constitutional rights from unreasonable search and seizure. Because the approach violated [Petties'] rights, the Fruit of the Poisonous Tree Doctrine mandates all evidence gathered following the violation be suppressed.

Brief for appellant at 6.

Both the Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, guarantee against unreasonable searches and seizures. *State v. Garcia, supra*. The ultimate touchstone is one of reasonableness. *Id*.

Recently, in *State v. Thomas*, 308 Neb. 312, 319-20, 953 N.W.2d 793, 801 (2021), the Nebraska Supreme Court reiterated the distinctions between the three tiers of police-citizen encounters:

> There are three distinct tiers of police-citizen encounters, each triggering a different analysis of the balance that should be struck between the government's interests and the invasion of privacy interests which a search or seizure entails.
>
> The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact is outside the realm of Fourth Amendment protection.
>
> The second tier, the investigative stop, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. It is an intermediate response. A second-tier encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards; but because of its less intrusive character, it requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.
>
> The third tier of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

Petties first argues that even if the officers' initial stop and investigation of Petties was a tier-two encounter, the police lacked reasonable suspicion to do so. He then argues that, because the police lacked reasonable suspicion to conduct the initial investigation, all evidence subsequently discovered must be suppressed. We disagree.

The very purpose of investigatory stops is to clarify ambiguous situations. *State v. Morrissey*, 19 Neb. App. 590, 810 N.W.2d 195 (2012). Even if it is equally probable that a vehicle

or its occupants are innocent of any wrongdoing, police must be permitted to act before their reasonable belief is verified by escape or fruition of the harm it is their duty to prevent. *Id.* In some circumstances, even wholly lawful conduct may justify the suspicion that criminal activity is afoot. *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996); *State v. Morrissey, supra*.

A police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. *State v. Thomas*, 240 Neb. 545, 483 N.W.2d 527 (1992). Police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the Fourth Amendment. *State v. Thomas, supra*. A reliable informant's tip to police concerning criminal activity may furnish a basis for reasonable suspicion supporting a *Terry* stop. *State v. Thomas, supra*.

The district court found that police officers had reasonable suspicion to conduct a *Terry* stop after observing the vehicles parked together and surmising they may be involved in a drug deal. More specifically, the district court set forth a list of factors which supported a finding of reasonable suspicion to conduct the initial stop, investigation, and short detention of Petties including information police obtained from a CI about Petties selling large quantities of drugs, information police obtained concerning Petties' prior criminal history and associated gang involvement, the police's prior knowledge of drug related activity in this particular high crime area conducted in the manner in which the vehicles were positioned, police identification of Petties' vehicle being present and positioned in a manner consistent with furthering a drug deal, and Petties' vehicle being parked next to a vehicle with no license plates. We agree with the district court that the totality of the circumstances supports a finding that police had reasonable suspicion to approach Petties and perform a brief stop to investigate possible criminal behavior on the facts of this record. Petties first argument fails.

Petties next argues that even if the facts supported a brief investigatory tier-two stop, the stop quickly ripened into a tier-three encounter requiring probable cause to continue the police encounter. Petties argues that because police did not have probable cause to search Petties or his vehicle at the time of the encounter, the evidence discovered thereafter should be suppressed.

The focus of Petties' argument stems from Officer Liebe's removal of his revolver shortly after he first encountered Petties. More specifically, after Liebe first approached Petties' driver's side window and observed Petties stuffing something down his pants, he unholstered his gun and ordered Petties to stop, show his hands, and exit the vehicle. To these facts, Petties specifically argues:

> Even if the Court were to find that either there was reasonable suspicion at the time the officers approached Appellant or that the encounter was first-tier despite Brandt's clear command to "hang tight," [Savage's] Fourth Amendment rights were violated again when (1) officers drawing their guns elevated the encounter to a third-tier arrest and (2) officers lacked probable cause to believe a crime had been committed at the moment weapons were drawn.

Brief for appellant at 10. Petties' argument is an extension of the Nebraska Supreme Court's statement in *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019), in which the court stated that detention may evolve into a de facto arrest if unreasonable force is used or if a stop lasts for an unreasonable amount of time. However, in *Shiffermiller*, the court also stated:

> We have noted that there is often a gray area between investigatory detentions and arrests. In *State v. Wells*, [290 Neb. 186, 859 N.W.2d 316 (2015),] we stated that whether a detention is reasonable under the circumstances depends on a multitude of factors, including the factors set forth in *United States v. Jones*, [759 F.2d 633 (8th Cir. 1985),] by the Eighth Circuit. These factors include "the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances."

302 Neb. at 255, 922 N.W.2d at 773-74.

But in *State v. Thomas*, 308 Neb. 312, 322-26, 953 N.W.2d 793, 802-04 (2021), the Nebraska Supreme Court addressed a similar contention stating:

> While not discussing the type of felony traffic stop procedures here presented, we have similarly found seizures to be second-tier encounters despite intrusions going somewhat beyond a typical investigatory stop, when the facts justified a reasonable belief that an officer or public safety was in danger. In *State v. Wells*, [290 Neb. 186, 859 N.W.2d 316 (2015),] we explained that the use of handcuffs does not transform a tier-two encounter into a tier-three encounter when using handcuffs is reasonably necessary to protect officer safety during an investigative stop, but that using handcuffs will transform the tier-two encounter into tier-three encounter when the facts do not justify a belief that the suspect may be dangerous.
>
> We said that, generally, if unreasonable force is used or if it lasts for an unreasonably long period of time, then an investigatory detention may turn into a de facto arrest. Whether a detention was reasonable under the circumstances depends on a multitude of factors, including (1) the number of officers and police vehicles involved; (2) the nature of the crime and whether there is a reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances. In *Wells*, noting the nature of the suspected crime of narcotics trafficking and that the defendant was digging in his pocket and concealing his right arm, we found that the officers' decision to gain control of the defendant's arm and handcuff him for a short time while conducting the investigation was a reasonable precaution and did not escalate the encounter to a tier three.

Similarly, in *State v. Shiffermiller*, we held that the use of handcuffs and a 30-to-40 minute investigation of a reported assault did not amount to third-tier encounter because this initial detention was not unreasonable, highly intrusive, or excessive in length. . . .

. . . .

The 10th Circuit Court of Appeals has analyzed on multiple occasions when forceful techniques used by police officers transform a second-tier encounter into a third-tier encounter, and its comparisons are helpful in this case. In *U.S. v. Shareef*, [100 F.3d 1491 (10th Cir. 1996),] the court held that a display of firearms, removing occupants from three stopped vehicles, and frisking and handcuffing them did not transform the second-tier encounter into a third-tier encounter because of the officers' reasonable belief that one of the motorists was armed and dangerous. Similarly, in *U.S. v. Perdue*, [8 F.3d 1455 (10th Cir. 1993),] the court held that the fact that two officers removed two occupants from a vehicle at gunpoint in a remote area and made them lie on the ground did not transform the second-tier encounter into a third-tier encounter, where officers reasonably believed occupants were armed and dangerous.

. . . .

We hold that where the facts available to a law enforcement officer would warrant a person of reasonable caution in the belief that an occupant of a vehicle is armed and dangerous and that the use of forceful techniques, including blocking the vehicle and displaying firearms when ordering the occupants out of the vehicle, are reasonably necessary to protect the officer's personal safety, the use of such techniques does not necessarily transform a second-tier encounter into a third-tier encounter. Such techniques, designated here as a "felony traffic stop," may under the circumstances be the least intrusive means reasonably available to verify or dispel the officer's suspicion.

We believe the principles articulated in *State v. Thomas* are applicable here. As we previously stated, police had reasonable suspicion to conduct a *Terry* stop of Petties in the parking lot. Upon approaching the driver's side window while Petties' passenger exited, Officer Liebe observed Petties' furtive movements in the vehicle coupled with his observation of Petties stuffing something in his pants. Officer Liebe, while withdrawing his weapon, ordered Petties to stop, show his hands, and exit the vehicle. We find that Officer Liebe's withdrawal of his weapon, which occurred within seconds of approaching the vehicle, was based upon a reasonable belief that Petties could be armed and dangerous and was reasonably necessary to protect the officers' personal safety. As such, the rather immediate reactions by police did not transform this second-tier encounter to a third-tier encounter. After vacating his vehicle, with Officer Liebe's weapon drawn, Petties admitted that the action Officer Liebe observed was Petties stuffing marijuana in his pants. This discovery was made during a second-tier encounter. Petties does not separately argue that the officers' search of his vehicle following the officers' detection of the odor of marijuana emanating from the car was unlawful so we do not address it. See *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

CONCLUSION

In sum, we agree with that the district court's factual finding that the initial stop in this case was an investigatory tier-two stop requiring reasonable suspicion. Under our de novo review, we find that there was reasonable suspicion to support the initial tier-two stop. Further, because the initial stop was not transformed to a tier-three encounter at the time Petties admitted he stuffed marijuana down his pants, we hold the court did not err in overruling Petties' motion to suppress. Accordingly, we affirm the district court's denial of Petties' motion to suppress, his conviction, and his sentence.

AFFIRMED.